Jessica L. Hunter (ID No. 282432018)
J. Burkett McInturff*
**WITTELS MCINTURFF PALIKOVIC**
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (914) 775-8862
Facsimile: (914) 775-8862
jlh@wittelslaw.com
jbm@wittelslaw.com

D. Greg Blankinship*
**FINKELSTEIN, BLANKINSHIP, FREI-PEARSON & GARBER, LLP**
One North Broadway, Suite 900
White Plains, New York 10601
Telephone: (914) 298-3281
gblankinship@fbfglaw.com

*Motion for Pro Hac Vice admission forthcoming*

*Attorneys for Plaintiffs George Fera, Joyce Fera,*
*Pinwheel Cafe LLC, and the Proposed Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **GEORGE FERA, JOYCE FERA, and PINWHEEL CAFE LLC,** on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>v.<br><br>**SOUTH BAY ENERGY CORP.,**<br><br>       Defendant. | Civil Case No.:  23-cv-22877<br><br>**CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND** |

## TABLE OF CONTENTS

NATURE OF THE CASE ................................................................................... 1

PARTIES .......................................................................................................... 3

JURISDICTION AND VENUE ......................................................................... 5

FACTUAL ALLEGATIONS ............................................................................. 6

    A.   The History Of Deregulation And ESCOs' Role In Energy Markets ................................ 6

    B.   Plaintiffs Joyce And George Fera's Dealings With South Bay ........................................ 11

    C.   Plaintiff Pinwheel Cafe's Dealings With South Bay ...................................................... 16

    D.   Defendant's Pricing Practices Are Misleading .............................................................. 24

    E.   Continuing Violation and Tolling ................................................................................. 25

CLASS ACTION ALLEGATIONS ................................................................... 25

CAUSES OF ACTION ...................................................................................... 29

COUNT I:  BREACH OF CONTRACT ............................................................. 29

COUNT II: BREACH OF THE IMPLIED COVENANT
            OF GOOD FAITH AND FAIR DEALING ............................................. 31

COUNT III: VIOLATION OF THE NEW JERSEY
             CONSUMER FRAUD ACT ............................................................... 32

COUNT IV: VIOLATION OF MATERIALLY IDENTICAL
             STATE CONSUMER PROTECTION STATUTES ............................. 36

COUNT V: VIOLATION OF THE TRUTH-IN-CONSUMER
            CONTRACT, WARRANTY, AND NOTICE ACT ("TCCWNA") ...................... 40

COUNT VI: VIOLATION OF THE EDECA AND RETAIL
            CHOICE CONSUMER PROTECTION REGULATIONS .................................. 41

COUNT VII: UNJUST ENRICHMENT ............................................................ 44

Plaintiffs George Fera, Joyce Fera (together, "the Feras"), and Pinwheel Cafe LLC ("Pinwheel Cafe") (collectively, "Plaintiffs"), by their attorneys, Wittels McInturff Palikovic and Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, bring this proposed class action in their individual capacities, and on behalf of a class of customers defined below, against Defendant South Bay Energy Corp. ("South Bay" or "Defendant") and hereby allege the following with knowledge as to their own acts, and upon information and belief, as to all other acts:

## NATURE OF THE CASE

1.    This action seeks to redress South Bay's deceptive and bad faith pricing practices that have caused thousands of commercial and residential customers in New Jersey, New York, Pennsylvania, Ohio, and Illinois to pay considerably more for their electricity and natural gas than they should otherwise have paid.

2.    South Bay is an independent energy service company ("ESCO") that has taken advantage of the deregulation of state retail energy markets by exploiting customers hoping to save on their electricity and/or natural gas costs.

3.    South Bay uniformly represents to New Jersey customers in its form customer contract that "the price for all energy sold under this Agreement shall be a variable price established each month by TPS[1] based upon market conditions." Ex. A at 2. South Bay's contract further represents that its variable natural gas rates "shall reflect South Bay Energy's wholesale cost of natural gas (including capacity, settlement, ancillaries, related transmission and distribution charges and other market-related factors); plus all applicable, fees, charges, costs, and South Bay Energy's expenses and margins," and that its variable electricity rates "shall

_____

[1] South Bay's "Variable Rate New Jersey Sales Agreement" defines itself as the "Agreement" and South Bay labels itself as "TPS." *See* **Exhibit A**, which is the contract South Bay contends applies to the Feras' purchases from Defendant.

reflect South Bay Energy's wholesale cost of electricity (including the cost of energy, capacity, settlement, ancillaries, related transmission and distribution charges and other market-related factors); plus all applicable, fees, charges, costs, and South Bay Energy's expenses and margins." *Id.*

4.    Upon information and belief, the Feras, Pinwheel Cafe, and all other South Bay customers in New Jersey were subject to the same contractual terms for their variable energy rates, which contractual terms are substantially similar to the variable rate contractual terms for all of South Bay's customers in the United States.

5.    South Bay's representations in its form customer contract about how its variable energy rates are determined are false and deceptive, and designed to take advantage of consumers' good faith and their lack of knowledge about, and access to, accurate wholesale and retail energy pricing information.  In reality, South Bay did not base its variable energy rates on "market conditions," and did not charge rates that "reflect South Bay Energy's wholesale cost[s]," but rather used a pricing methodology that focused on maximizing profits.

6.    As a result of South Bay's unlawful acts described herein, thousands of unsuspecting South Bay customers have been, and continue to be, fleeced by South Bay out of millions of dollars in exorbitant charges for electricity and natural gas.  Defendant's scheme, which often affects society's most vulnerable citizens, is immoral, unethical, oppressive, and unscrupulous.

7.    Further, South Bay's form customer contract violates several disclosure requirements mandated by New Jersey regulations (which are similar to other states' regulations).  The regulations' purpose is to protect energy customers from ESCOs' price gouging, and they are designed to inform the customer, ahead of time, of the precise formula by

which the customer's rates will be determined.  One of the obvious benefits of the regulations is that the customer is supposed to be apprised of how their ESCO's rates are calculated and set. Another benefit is that customers can protect themselves if the ESCO deviates from its promised formula.  Here, South Bay ran roughshod over New Jersey regulations and, as a result, was able to charge variable energy rates that were consistently double, or even triple, market prices for energy.  South Bay's violation of New Jersey regulations is actionable by its customers via New Jersey's consumer protection statutes.

8.      Plaintiffs and other South Bay customers (the "Class") have been injured by Defendant's unlawful practices.  Plaintiffs and the Class therefore seek damages, restitution, statutory penalties, and declaratory and injunctive relief for South Bay's breach of contract, breach of the duty of good faith and fair dealing, violation of state regulations, violation of state consumer protection statutes, and/or unjust enrichment.

9.      Only through a class action can South Bay's customers remedy Defendant's ongoing wrongdoing.  Because the monetary damages suffered by each customer are small compared to the much higher cost a single customer would incur in trying to challenge South Bay's unlawful practices, it makes no financial sense for an individual customer to bring his or her own lawsuit.  Further, many customers do not realize they are victims of South Bay's deceptive and unlawful conduct.  With this class action, Plaintiffs and the Class seek to level the playing field and make sure that companies like South Bay engage in fair and upright business practices.

## PARTIES

10.      Plaintiffs Joyce and George Fera are married and reside in Port Murray in Warren County, New Jersey.  South Bay began supplying electricity to the Feras' home in November

2022.  The Feras were South Bay variable rate electricity customers until January 2023.

Unbeknownst to the Feras, South Bay charged exorbitant rates every month.   While Plaintiff

George Fera's name is on the Feras' utility account with Jersey Central Power & Light Company

("JCP&L"), Plaintiff Joyce Fera manages their account, handled the Feras' enrollment into South

Bay, and was the person South Bay's marketers spoke to on November 8, 2022 when they called

to solicit the Feras to switch to South Bay.  Among other acts, Ms. Fera was recorded on the

November 8 South Bay phone call with Defendant's "verbatim verification system" that

confirmed "your selection of South Bay Energy as your provider of electricity" on the Feras'

JCP&L account.  On this same call, Ms. Fera stated that she had the authority to make changes to

the Feras' electricity account and agreed to South Bay's "terms of service as described by the

South Bay Energy representative that this is a month-to-month agreement with a variable rate."

Following Ms. Fera's call with South Bay, she relayed the conversation to Mr. Fera, and they

jointly agreed to proceed with the enrollment.  Upon information and belief, South Bay policies

and practices allow spouses like Ms. Fera to enroll a customer's utility account into South Bay.

Upon information and belief, and as reflected in the November 8 call, it is South Bay's practice

to have its representatives describe and review Defendant's form customer contract with its

customers.

11.     As a result of Defendant's deceptive and otherwise improper and unauthorized

conduct, the Feras incurred excessive charges for electricity.

12.     Plaintiff Pinwheel Cafe is a limited liability company organized under the laws of

New Jersey.  Pinwheel Cafe has four members, three of whom are citizens of New Jersey and

one of whom is a citizen of West Virginia.  Pinwheel Cafe's managing member is Stephen

Tseng, who is a New Jersey citizen.  Pinwheel Cafe operates Pinwheel Garden, a restaurant

located in Jersey City, New Jersey.  South Bay began supplying variable rate electricity and natural gas to Pinwheel Cafe at the Pinwheel Garden restaurant in February 2022.  Pinwheel Cafe was a South Bay customer until November 2022.  Unbeknownst to Pinwheel Cafe, South Bay charged it exorbitant rates every month.

13.    As a result of Defendant's deceptive and otherwise improper and unauthorized conduct, Pinwheel Cafe incurred excessive charges for electricity and natural gas.

14.    Defendant South Bay Energy Corp. is a New York corporation headquartered at 700 Veterans Memorial Highway, Suite 210, Hauppauge, New York, 11788.

## JURISDICTION AND VENUE

### *Subject Matter Jurisdiction*

15.    This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and Defendant.

### *Personal Jurisdiction*

16.    This Court has specific personal jurisdiction over Defendant because it maintains sufficient contacts in this jurisdiction, including the advertising, marketing, distribution, and sale of electricity and gas to New Jersey customers, including Plaintiffs.

### *Venue*

17.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1).  Substantial acts in furtherance of the alleged improper conduct occurred within this District.  At all relevant times, South Bay supplied energy to Plaintiffs' properties located in this District.

## FACTUAL ALLEGATIONS

**A.    The History Of Deregulation And ESCOs' Role In Energy Markets**

18.    In 1999, New Jersey's legislature and the New Jersey Board of Public Utilities ("NJBPU") deregulated New Jersey's market for electricity and natural gas.  Among deregulation's goals was increased competition, with an eye towards achieving greater customer choice and an overall reduction of energy rates.  As a result, energy supply in New Jersey is open to competition, and customers can choose their energy supplier.

19.    The new energy suppliers, ESCOs, compete against local utilities such as JCP&L, the Feras' local utility, and Public Service Electric and Gas Company ("PSE&G"), Pinwheel Cafe's local utility.  While ESCOs supply the customer's energy, the delivery of electricity and gas to homes and small businesses remains the local utilities' job.

20.    Before deregulation, retail consumers had to purchase both the supply *and* the delivery of electricity and natural gas from the local utility.  The public policy motivation for allowing customers a choice of energy suppliers is to enable retail customers to take advantage of competition between suppliers in the open market, as compared to the monopolistic and heavily regulated utility.  The premise behind this policy is that competition would result in ESCOs being more aggressive than the monopoly utility in reducing wholesale purchasing costs and thereby lower prices for retail customers.

21.    Customers in deregulated states like New Jersey who do not choose to switch to an ESCO for their energy supply continue to receive their supply from their local utility.

22.    In New Jersey, the NJBPU holds market-based auctions for utilities to purchase electricity and natural gas at wholesale on behalf of their customers; the utilities then charge these customers a rate based upon the market-based auction outcome.  A third-party consultant on behalf of the NJBPU manages the auctions, and the bidding processes and results are made

publicly available.  As a result, these auctions reflect market conditions.  A similar process is used in Pennsylvania, Ohio, New York, and Illinois.

23.     ESCOs such as South Bay have various options to buy energy at wholesale for resale to retail customers, including: owning energy production facilities; purchasing energy from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and by purchasing energy in advance of the time it is used by consumers, either by purchasing physical energy to be used in the future or by purchasing futures contracts for the delivery of energy in the future at a predetermined price.  The purpose of deregulation is to allow ESCOs to use these and other innovative purchasing strategies to reduce energy costs and pass those savings on to consumers.

24.     Because of their increased flexibility, ESCOs can offer rates competitive with—if not substantially lower than—the utilities' rates, and some do.  Yet South Bay's variable rates are consistently and substantially higher than the local utilities' and wholly detached from market conditions and South Bay's wholesale costs; accordingly, no consumer would ever agree to South Bay's variable rate if they knew the truth.  The only way South Bay can retain variable rate customers is by hiding the fact that South Bay's rates are based not on market conditions and its wholesale costs, but South Bay's unbridled price gouging and profiteering.

25.     Customers that do not choose to switch to an ESCO for their energy supply continue to receive their supply from their local utility.  However, if a customer switches to an ESCO, the customer will have his or her energy "supplied" by the ESCO, but still "delivered" by their existing utility.  The customer's existing utility also continues to bill the customer for both the energy supply and delivery costs.  The only difference to the customer is which company sets the price for the customer's energy supply.

26.     As part of the deregulation plan, ESCOs (like South Bay) do not have to file or seek approval for the electricity or natural gas rates they charge or the methods by which they set their rates with the NJBPU.

27.     Following deregulation, New Jersey enacted legislation to regulate interactions among ESCOs and consumers.  A major component of the legislative scheme is a series of regulations, N.J.A.C. 14:4-7.1, *et seq.* enacted in 2008.  Relevant to this case are the "Pricing Regulations" and "Marketing Regulations" that apply to a "Third party supplier" or "TPS" of electricity or gas as defined in New Jersey's Electric Discount and Energy Competition Act ("EDECA").  N.J.S.A. 14:4-1.2; N.J.A.C. 14:4-7.1.  South Bay is a TPS.

28.      The Marketing Regulations require, *inter alia*, that for variable rate products, "the TPS shall describe in clear and conspicuous language the mechanism or formula by which the price is determined, and provide a detailed customer bill comparison[.]"  N.J.A.C. 14:4-7.4(b)(2).  The "Pricing Regulations" require that the terms and conditions of a TPS contract contain "a clear and unambiguous statement of the precise mechanism or formula by which the price will be determined."  N.J.A.C. 14:4-7.6(b)(2).

29.     South Bay's contract violates both the Pricing and Marketing Regulations.

30.     South Bay's contract violates the Pricing Regulations because it does not contain a clear and unambiguous statement of the precise mechanism or formula by which South Bay's variable rates will be determined.  Instead, South Bay's contract describes how variable rates are set as follows:

> Unless otherwise agreed to in writing, the price for all energy sold under this Agreement shall be a variable price established each month by TPS based upon market conditions. The Variable Price for Natural Gas shall reflect South Bay Energy's wholesale cost of natural gas (including capacity, settlement, ancillaries, related transmission and distribution charges and other market-related factors); plus all applicable, fees, charges, costs, and South Bay Energy's expenses and margins.

The Variable Price for Electricity shall reflect South Bay Energy's wholesale cost of electricity (including the cost of energy, capacity, settlement, ancillaries, related transmission and distribution charges and other market-related factors); plus all applicable, fees, charges, costs, and South Bay Energy's expenses and margins. **A Variable Price Agreement, means that the price for electricity and/or natural gas supplied during the term of the Agreement may change from time-to-time based on various factors, including weather fluctuations. Under a Fixed Rate Agreement the price for electricity and/or natural gas supplied will remain the same each month during the term of the Agreement. South Bay's rate may be higher or lower than your LDC's rate in any particular month, and there is not guarantee of savings**.

31.     Ex. A at 2 (emphasis in original). The above statement does not constitute "a clear and unambiguous statement of the precise mechanism or formula by which the price will be determined." N.J.A.C. 14:4-7.6(b)(2). While the statement above commits South Bay to charging a variable rate "based upon market conditions" and that the price "shall reflect South Bay Energy's wholesale cost[s]" plus South Bay's documented non-supply costs like overhead and South Bay's "margins," the statement does not, for example, (i) disclose South Bay's exorbitant margin, (ii) advise as to what percentage weight each of the various components have in driving Defendant's variable rates, (iii) point the customer to where they can determine South Bay's "wholesale cost[s]," or (iv) even disclose and identify the amount of South Bay's "applicable, fees, charges, costs and South Bay Energy's expenses."

32.     South Bay's contract also constitutes marketing under the Marketing Regulations because the contract is not binding on consumers once signed. Instead, New Jersey customers have seven days to rescind their contracts from the date they receive a confirmation notice of their choice of supplier. N.J.A.C. 14:4-7.6(b)(4). During this seven-day period, South Bay's contract served as a solicitation for the purpose of persuading the customer to authorize a switch to South Bay for electric and gas supply service. N.J.A.C. 14:4-7.4(a).

33.    South Bay's contract violates the Marketing Regulations in at least the following

four ways:

      a.    South Bay's contract does not provide potential customers "the average price per kWh for electric generation service or the average price per therm for gas supply service being charged for basic generation service or basic gas supply service by the [relevant local utility] over the same period" as the contract's duration.  N.J.A.C. 14:4-7.4(a)(4).  In fact, South Bay's contract does not mention any local utility pricing whatsoever.

      b.    South Bay's contract does not "describe in clear and conspicuous language the mechanism or formula by which the price is determined, and provide a detailed customer bill comparison" with the requisite information set forth in N.J.A.C. 14:4-7.4(b)(1).  Instead, South Bay's contract states only the description excerpted in paragraph 30 above.

      c.    South Bay's contract does not point potential customers to a telephone number or website "which a customer may access to request detailed information concerning the average price per kWh for electric generation service or average price per therm for gas supply service over the term of a contract for the service being offered, exclusive of any charges for any optional services."  N.J.A.C. 14:4-7.4(a)(1).  Instead, South Bay's contract simply lists its telephone number without any reference whatsoever regarding where a customer can access information about South Bay's average variable rates.

      d.    To the extent South Bay claims its exorbitant rates are due to its provision of optional services, South Bay's contract fails to "clearly and conspicuously identify each separate charge."  N.J.A.C. 14:4-7.4(g).

34.    By failing to provide the critical information required under the Pricing and

Marketing Regulations, Defendant was able to inflict the precise harm that Plaintiffs suffered—

being unknowingly overcharged for their energy.

35.    South Bay took advantage of deregulation and the lack of regulatory oversight to

charge consumers exorbitant rates for electricity and gas.  In theory, energy deregulation allows

consumers to shop around for the best energy rates, and it allows consumers to take advantage of

market-based rates that decline when wholesale costs decline.  However, South Bay exploits

deregulated markets by consistently charging its customers far more than the local utility for the same energy and failing to adequately disclose how its variable rates are determined.

**B.    Plaintiffs Joyce And George Fera's Dealings With South Bay**

36.    On or around November 8, 2022 a South Bay salesperson called the Feras' home to solicit them to switch their electricity account to South Bay.  During this encounter South Bay's representative went over South Bay's offering, and based on those representations, the Feras believed and understood that they would be charged a variable rate based on market conditions and reflecting South Bay's costs.  The Feras were not advised that South Bay's understanding of its contract apparently was that customers would be charged a rate that was much higher than their utility's rate and was driven by South Bay's excessive margins.

37.    From November 2022 until January 2023, South Bay supplied electricity to the Feras' residence in Port Murray, New Jersey.

38.    South Bay uniformly represents to its New Jersey customers that its variable rates for electricity will be "based upon market conditions" and will "reflect South Bay Energy's wholesale cost of electricity (including the cost of energy, capacity, settlement, ancillaries, related transmission and distribution charges and other market-related factors); plus all applicable, fees, charges, costs, and South Bay Energy's expenses and margins."  Ex. A at 2.

39.    Upon information and belief, the Feras were subject to the same contractual terms for their variable rate for electricity as South Bay's other New Jersey customers, which are substantially similar to the variable rate contractual terms for all South Bay gas and electric customers in the United States.

40.    In light of South Bay's representations, any reasonable consumer, including the Feras, would reasonably expect that South Bay's variable rates would reflect wholesale market costs and be competitive with Defendant's competitors' rates.

41.    Unfortunately, South Bay did not provide its customers with competitive market variable rates reflective of South Bay's wholesale supply costs.  Instead, South Bay charged its customers variable rates that were untethered from its wholesale costs and market-related factors to maximize its own profits.

42.    Price is the most important consideration for energy consumers.  Given that there is no difference at all in the electricity and gas that ESCOs supply as opposed to the consumer's local utility, the only reason a consumer would switch to an ESCO is for the potential savings offered in a competitive market as opposed to prices offered by a regulated utility.

43.    The local utility's rates, like JCP&L's (the utility serving the Feras), serve as an ideal indicator of the wholesale cost of energy and the other applicable market-based factors because these rates reflect the wholesale cost of energy and the associated market costs that are the same costs ESCOs like South Bay incur.  In fact, Defendant has a tactical advantage over the utility as it can purchase energy from highly competitive markets for future use, and, therefore, its costs for purchasing energy should at the very least reflect (if not undercut) market prices, albeit over a longer term.  Therefore, while the utility's rates might not precisely match Defendant's rates, the latter's rates should correlate with the utility's rates and over time should be roughly similar.  Instead, South Bay's rates were wildly incongruent.

44.    The following table compares the Feras' electricity supply rates from South Bay to their local utility JCP&L's contemporaneous supply rate during the period they were South Bay customers.

| Billing Period | South Bay Rate ($/kWh) | JCP&L Rate ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 11/29/2022–12/28/2022 | 0.1789 | 0.0929 | 1.9x | 92% |
| 12/29/2022–1/27/2023 | 0.2013 | 0.0929 | 2.2x | 117% |

45.    The "Overcharge Factor" and "Overcharge Percentage" columns demonstrate the drastic difference between South Bay's rates for the Feras' account and JCP&L's contemporaneous rates.  South Bay's rates were, on average, more than double JCP&L's rates.

46.    JCP&L's supply rate, charged to those customers in the Feras' geography who do not select an ESCO, reflects market conditions.  As explained above, JCP&L is South Bay's primary competitor in the Feras' service territory, and JCP&L's rates encompass the average wholesale price of electricity and associated costs over time without any markup, making it an ideal comparator.

47.    The disconnect between JCP&L's rates and South Bay's rates further demonstrates that South Bay's rates did not even remotely reflect South Bay's wholesale supply costs.

48.    South Bay should have been able to procure electricity and gas at a *lower* cost than the utility given its tactical advantages over JCP&L.  As explained above, South Bay can purchase electricity and gas from any number of sources using a variety of purchasing and hedging strategies.  Its cost for purchasing gas or electricity, therefore, should have at least reflected, if not undercut, JCP&L's prices.

49.    Instead, South Bay's rates were consistently and significantly higher than JCP&L's rates.  South Bay did not adequately disclose to the Feras that its variable electricity and gas rates are consistently and significantly higher than the rates their local utilities charge.

South Bay likewise failed to adequately disclose to the Feras that in paying Defendant's variable energy rates, they were receiving no added material benefit at a dramatically higher price than if they had bought their energy from their utility.  South Bay also failed to provide customers with adequate advance notice of the variable rates it would charge and failed to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged.

50.     A reasonable consumer understands and expects that South Bay's variable energy rates will reflect the wholesale price for gas and electricity, that is, the market price available to South Bay for the gas and electricity it in turn supplies to its retail customers.

51.     However, South Bay's variable rates are so much higher than wholesale market prices that they do not reflect market conditions.

52.     No reasonable customer, including the Feras, would expect an ESCO's variable rate to be artificially inflated beyond any resemblance to the local utility's costs.  Indeed, the fact that South Bay's rates were consistently **_double_** JCP&L's rates demonstrates the extent of its unscrupulous price gouging.

53.     South Bay knew that its variable rates were consistently and significantly higher than the local utility's rates.

54.     Defendant's failure to disclose this fact was a material omission and was materially misleading because the most important consideration for any consumer choosing an energy supplier is price; energy is a fungible commodity.

55.     Moreover, Defendant at no time alerted or informed the Feras that the cost for electricity would be continuously _significantly_ higher than the same electricity sold by JCP&L.

56.     No reasonable consumer who knew the truth about South Bay's exorbitant rates would have chosen it as an energy supplier.

57.     Other than potential price savings, there is nothing to materially differentiate South Bay from the local utility, and the potential for price savings is the ***only*** reason any reasonable consumer would become a South Bay customer.

58.     South Bay lulled consumers into purchasing its energy supply via material omissions about its variable energy rates.  Defendant did so to reap excessive profits at the expense of unsuspecting consumers.  Defendant acted with actual malice, or wanton and willful disregard, for consumers' well-being.

59.     A comparison of South Bay's rates to prevailing wholesale market costs also demonstrates that South Bay does not charge a rate based on the factors it promised in its form customer contract.

60.     The table below compares the rates the Feras were charged by South Bay to the contemporaneous "Market Supply Costs."  The Market Supply Costs represent the market costs and other factors that determine the costs that South Bay and other ESCOs incur in providing energy to retail customers.  That South Bay's rates are so vastly different from the utility's costs or the Market Supply Costs demonstrates that South Bay's variable rates are not reflective of market conditions or its wholesale costs.

| Billing Period | South Bay Rate ($/kWh) | Market Supply Cost ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 11/29/2022–12/28/2022 | 0.1789 | 0.1284 | 1.4x | 39% |
| 12/29/2022–1/27/2023 | 0.2013 | 0.0623 | 3.2x | 223% |

61.    Again, South Bay's variable rates are, on average, more than double the rate based on market supply costs, which further demonstrates that South Bay's rates are not set in accordance with its wholesale costs and that its rates are not based on market conditions.  Any reasonable customer, including the Feras, would reasonably expect that a rate "based upon market conditions" would be "based upon" South Bay's electricity supply costs and that the other factors, including South Bay's "expenses and margins," would reflect a reasonable fixed profit margin added to South Bay's supply costs and documented overhead.  This understanding is reinforced by the contract's commitment that the "Variable Price for Electricity shall reflect South Bay Energy's wholesale cost of electricity" that the variable rate "may change from time-to-time based on various factors, including weather fluctuations," as such fluctuations affect South Bay's supply costs but not its documented overhead or the fixed profit margin that follows from a rate that is based upon market conditions.

62.    In addition, South Bay's rates failed to fluctuate in accordance with Market Supply Costs, demonstrating that South Bay's rates are untethered from market conditions and do not reflect South Bay's wholesale costs.  Between December 2022 and January 2023, the Market Supply Costs declined dramatically from $0.13/kWh to $0.06/kWh.  At the same time, South Bay's rate *increased* from $0.18/kWh to $0.20/kWh.

**C.    Plaintiff Pinwheel Cafe's Dealings With South Bay**

63.    In or around January 2022, a South Bay salesperson visited the Pinwheel Garden restaurant in Jersey City, New Jersey to solicit Pinwheel Cafe to switch its electric and natural gas accounts to South Bay.  Stephen Tseng, Pinwheel Cafe's managing member, spoke to South Bay's salesperson and later enrolled Pinwheel Cafe in South Bay.  From February 2022 until November 2022, South Bay supplied Pinwheel Cafe's electricity and natural gas at Pinwheel Garden.

64.     Upon information and belief, Pinwheel Cafe was subject to the same contractual terms for its variable rates for electricity and natural gas as South Bay's other New Jersey customers, including the Feras.

65.     The following table compares Pinwheel Cafe's electricity supply rates from South Bay to its local utility PSE&G's contemporaneous electricity supply rate during the period it was a South Bay customer.

| Billing Period | South Bay Rate ($/kWh) | PSE&G Rate ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 3/22/2022–4/20/2022 | 0.17978 | 0.13428 | 1.3x | 34% |
| 4/21/2022–5/19/2022 | 0.19278 | 0.13595 | 1.4x | 42% |
| 5/20/2022–6/17/2022 | 0.19926 | 0.13831 | 1.4x | 44% |
| 6/18/2022–7/20/2022 | 0.19657 | 0.14016 | 1.4x | 40% |
| 7/21/2022–8/18/2022 | 0.19934 | 0.14018 | 1.4x | 42% |
| 8/19/2022–9/19/2022 | 0.21187 | 0.12849 | 1.6x | 65% |
| 9/20/2022–10/18/2022 | 0.24243 | 0.11756 | 2.1x | 106% |
| 10/19/2022–11/16/2022 | 0.23930 | 0.11590 | 2.1x | 106% |

66.     The "Overcharge Factor" and "Overcharge Percentage" columns demonstrate the drastic difference between South Bay's electric rates for Pinwheel Cafe's account and PSE&G's contemporaneous rates.  South Bay's rates were, on average, nearly 1.6 times higher than PSE&G's rates.

67.     In addition, South Bay's rates failed to fluctuate in accordance with PSE&G's rates, demonstrating that South Bay's rates are untethered from market conditions.  For example, from July 2022 through November 2022, PSE&G's rate steadily declined from $0.14/kWh to $0.116/kWh.  At the same time, South Bay's rates *increased* from $0.20/kWh to $0.24/kWh.

68.     In fact, South Bay's rates follow a "glide path" model.  South Bay starts from a relatively low rate and then raises the variable rate in increasing increments so that customers are unlikely to notice that their energy bills have crept to stratospheric prices.  This is a deceptive and unfair practice.

69.     An analysis of South Bay's natural gas pricing reveals a similar practice of levying excess margins and charging rates that are untethered to market conditions.  The following table compares Pinwheel Cafe's variable natural gas supply rates from South Bay to PSE&G's contemporaneous rate.

| Billing Period | South Bay Rate ($/therm) | PSE&G Rate ($/therm) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 3/22/2022–4/20/2022 | 0.69 | 0.41 | 1.7x | 67% |
| 4/21/2022–5/19/2022 | 0.75 | 0.41 | 1.8x | 83% |
| 5/20/2022–6/17/2022 | 0.95 | 0.41 | 2.3x | 131% |
| 6/18/2022–7/20/2022 | 0.87 | 0.41 | 2.1x | 113% |
| 7/21/2022–8/18/2022 | 0.94 | 0.41 | 2.3x | 129% |
| 8/19/2022–9/19/2022 | 1.04 | 0.41 | 2.5x | 153% |
| 9/20/2022–10/18/2022 | 1.14 | 0.58 | 2.0x | 97% |
| 10/19/2022–11/16/2022 | 0.85 | 0.65 | 1.3x | 30% |

70.     As with Pinwheel Cafe's electricity account, the overcharge columns demonstrate the drastic difference between South Bay's rates for Pinwheel Cafe's natural gas account and PSE&G's contemporaneous rates.  South Bay's rates were *frequently* more than double PSE&G's rates during this eight-month period.

71.     PSE&G's supply rate, charged to those customers in Pinwheel Cafe's geography who do not select an ESCO, reflects market conditions.  As explained above, PSE&G is South Bay's primary competitor in Pinwheel Cafe's service territory, and PSE&G's rates encompass the average wholesale price of energy and associated costs over time without any markup, making it an ideal comparator.

72.    The disconnect between PSE&G's rates and South Bay's rates further demonstrates that South Bay's rates did not even remotely reflect did not even remotely reflect South Bay's wholesale supply costs.

73.    South Bay should have been able to procure electricity and gas at a ***lower*** cost than the utility given its tactical advantages over PSE&G.  As explained above, South Bay can purchase electricity and gas from any number of sources using a variety of purchasing and hedging strategies.  Its cost for purchasing gas or electricity, therefore, should have at least reflected, if not undercut, PSE&G's prices.

74.    Instead, South Bay's rates were consistently and significantly higher than PSE&G's rates.  South Bay did not adequately disclose to Pinwheel Cafe that its variable electricity and gas rates are consistently and significantly higher than the rates PSE&G charges. South Bay likewise failed to adequately disclose to Pinwheel Cafe that in paying Defendant's variable energy rates, it was receiving no added material benefit at a dramatically higher price than if it had bought its energy from the utility.  South Bay also failed to provide customers like Pinwheel Cafe with adequate advance notice of the variable rates it would charge and failed to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged.

75.     A reasonable consumer understands and expects that South Bay's variable energy rates will reflect the wholesale price for gas and electricity, that is, the market price available to South Bay for the gas and electricity it in turn supplies to its retail customers.

76.    However, South Bay's variable rates are so much higher than wholesale market prices that they do not reflect market prices.

77.     No reasonable customer, including Pinwheel Cafe, would expect an ESCO's variable rate to be artificially inflated beyond any resemblance to the local utility's costs. Indeed, the fact that South Bay's rates were often **double** PSE&G's rates demonstrates the extent of its unscrupulous price gouging.

78.     South Bay knew that its variable rates were consistently and significantly higher than the local utility's rates.

79.     Defendant's failure to disclose this fact was a material omission and was materially misleading because the most important consideration for any consumer choosing an energy supplier is price; energy is a fungible commodity.

80.     Moreover, Defendant at no time alerted or informed Pinwheel Cafe that the cost for electricity and natural gas would be continuously *significantly* higher than the same energy sold by PSE&G.

81.     No reasonable consumer who knew the truth about South Bay's exorbitant rates would have chosen it as an energy supplier.

82.     Other than potential price savings, there is nothing to materially differentiate South Bay from the local utility, and the potential for price savings is the **only** reason any reasonable consumer would become a South Bay customer.

83.     South Bay lulled consumers into purchasing its energy supply via material omissions about its variable energy rates.  Defendant did so to reap excessive profits at the expense of unsuspecting consumers.  Defendant acted with actual malice, or wanton and willful disregard, for consumers' well-being.

84.    A comparison of South Bay's rates to prevailing market costs also demonstrates that South Bay does not charge a rate based on the factors it promised in its form customer contract.

85.    The table below compares the electricity rates Pinwheel Cafe was charged by South Bay to the contemporaneous "Market Supply Costs." Each of these measures reflects the costs that South Bay's competitors, in the regulated or deregulated markets, incur. That South Bay's rates are so vastly different from the utility's costs or the Market Supply Costs demonstrates that South Bay's rates are not reflective of market conditions or its wholesale costs.

| Billing Period | South Bay Rate ($/kWh) | Market Supply Cost ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 3/22/2022–4/20/2022 | 0.17978 | 0.09 | 2.0 | 100% |
| 4/21/2022–5/19/2022 | 0.19278 | 0.09 | 2.0 | 104% |
| 5/20/2022–6/17/2022 | 0.19926 | 0.11 | 1.8 | 84% |
| 6/18/2022–7/20/2022 | 0.19657 | 0.10 | 1.9 | 94% |
| 7/21/2022–8/18/2022 | 0.19934 | 0.14 | 1.5 | 48% |
| 8/19/2022–9/19/2022 | 0.21187 | 0.12 | 1.8 | 77% |
| 9/20/2022–10/18/2022 | 0.24243 | 0.09 | 2.8 | 183% |
| 10/19/2022–11/16/2022 | 0.23930 | 0.08 | 3.2 | 218% |

86.    Again, South Bay's variable rates were *frequently* double, and sometimes triple, the rate based on market supply costs, which further demonstrates that South Bay's rates are not set in accordance with its wholesale costs and that its rates are not based on market conditions.

87.    In addition, South Bay's rates fail to fluctuate in accordance with Market Supply Costs.  For example, from August 2022 through November 2022, Market Supply Costs steadily declined from $0.14/kWh to $0.08/kWh.  At the same time, South Bay's rates *increased* from $0.20/kWh to $0.24/kWh.

88.    The story is similar for Pinwheel Cafe's natural gas charges.  The following table represents Pinwheel Cafe's South Bay natural gas rates versus the Market Supply Costs.

| Billing Period | South Bay Rate ($/therm) | Market Supply Cost ($/therm) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 3/22/2022–4/20/2022 | 0.69 | 0.71 | N/A | N/A |
| 4/21/2022–5/19/2022 | 0.75 | 0.78 | N/A | N/A |
| 5/20/2022–6/17/2022 | 0.95 | 0.82 | 1.1x | 15% |
| 6/18/2022–7/20/2022 | 0.87 | 0.66 | 1.3x | 33% |
| 7/21/2022–8/18/2022 | 0.94 | 0.66 | 1.4x | 41% |
| 8/19/2022–9/19/2022 | 1.04 | 0.81 | 1.3x | 29% |
| 9/20/2022–10/18/2022 | 1.14 | 0.79 | 1.4x | 45% |
| 10/19/2022–11/16/2022 | 0.85 | 0.72 | 1.2x | 17% |

89.    Again, South Bay's charges were substantially higher than Market Supply Costs in six out of the eight billing periods.  Here too, South Bay's rates follow a "glide path" model, beginning with a low rate—lower, in fact, than the Market Supply Cost—before steadily rising in increasing increments so that customers are unlikely to notice that their energy bills have crept to stratospheric prices completely untethered from market conditions.

D.      **Defendant's Pricing Practices Are Misleading**

90.      The market cost of wholesale energy is the primary component of the non-overhead costs South Bay incurs.  As explained above, the other cost factors that may affect South Bay's variable rate are included in the local utilities' costs as well.  These additional wholesale costs are relatively insignificant in terms of the overall costs Defendant incurs to provide retail energy, and do not substantially fluctuate over time.  Moreover, other ESCOs incur these costs as well, yet they offer substantially lower rates.

91.      Therefore, Defendant's non-overhead cost factors cannot explain Defendant's egregiously high variable rates or the reason its rates are disconnected from changes in wholesale costs.  Further, South Bay's overhead costs (which are relatively minor compared to its energy supply costs) also cannot explain the high variable rates charged.

92.      South Bay's ability to make a profit does not justify its outrageously high rates.  A reasonable customer might understand that an ESCO will attempt to make a reasonable profit by selling customers retail energy.  However, such a customer would also expect that such profits would be consistent with profit margins obtained by other suppliers of energy in their respective markets and that South Bay's profiteering at the expense of its customers would not be so extreme that its rate bears no relation to a rate based on wholesale costs but is instead outrageously higher.

93.      South Bay knew that once it had acquired the consumer's energy account, it could charge high energy rates and many consumers (if not most) would not know, and simply pay the exorbitant charges, month after month.

94.      It is well-established that defaults are powerful drivers of consumer behavior.  There are various factors underlying this human tendency that have been discussed in

the judgment and decision-making literature, such as the work about defaults, the "status quo bias,"[2] and "Nudges."[3]

95.     Defendant's exploitation of consumer inertia is further exacerbated by the fact that it is unlikely that consumers will compare South Bay's prices with what their local utility is charging, or that they will understand the differences in the two companies' charges so as to make the comparison effective.

96.     No reasonable consumer would expect that South Bay would charge them more than the utility by so much money for so long.

97.     Thus, South Bay's omissions with respect to the rates it would charge were materially misleading.

**E.    Continuing Violation and Tolling**

98.     Given that Defendant has engaged in a series of deceptive acts and omissions for which it billed consumers and consumers continued to pay, the continuing violation doctrine applies, effectively tolling the limitations period until the date of South Bay's last wrongful act.

## CLASS ACTION ALLEGATIONS

99.     Plaintiffs bring this action on their own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class of all South Bay customers in the United States who were charged a variable rate for electricity and/or gas services by South Bay from the earliest allowable date through the date of judgment (the "Class").

---

[2] Daniel Kahneman, Jack L. Knetsch and Richard H. Thaler (1991), "Endowment Effect, Loss Aversion, and Status Quo Bias," *The Journal of Economic Perspectives*, Vol. 5, pp. 193–206.

[3] R. Thaler and S. Sunstein (2008), *Nudge*, Yale University Press.

100.     As alleged throughout this Complaint, the Class claims all derive directly from a single course of conduct by Defendant.  Defendant has engaged in uniform and standardized conduct toward the Class—its marketing and billing practices—and this case is about the responsibility of Defendant for its knowledge and conduct in deceiving its customers.  This conduct did not meaningfully differentiate among individual Class members in its degree of care or candor, its actions or inactions, or in its omissions.  Upon information and belief, the variable rate provisions in the customer agreements for all of South Bay's customers (the "Class Members") are materially the same.

101.     The Class, preliminarily defined as two subclasses ("Subclasses"), is as follows:

a.   The Multistate Class, preliminarily defined as all South Bay customers in the United States charged a variable rate for electricity and/or natural gas by South Bay.

b.   The New Jersey Class, preliminarily defined as all South Bay customers in the state of New Jersey who were charged a variable rate for electricity and/or natural gas by South Bay.

102.     Excluded from the Class are Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendant.

103.     Plaintiffs reserve the right, as might be necessary or appropriate, to modify or amend the definition of the Class and/or add additional Subclasses, when Plaintiffs file their motion for class certification.

104.     Plaintiffs do not know the exact size of the Class since such information is in the exclusive control of South Bay.  Plaintiffs believe, however, that based on the publicly available data concerning Defendant's customers in the United States, the Class encompasses at least tens of thousands of individuals whose identities can be readily ascertained from Defendant's records.

Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

105.    The Class is ascertainable because its members can be readily identified using data and information kept by Defendant in the usual course of business and within its control. Plaintiffs anticipate providing appropriate notice to each Class Member in compliance with all applicable federal rules.

106.    Plaintiffs are adequate class representatives.  Their claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class. Plaintiffs and the other members of the Class were subject to the same or similar conduct engineered by the Defendant.  Further, Plaintiffs and members of the Class sustained substantially the same injuries and damages arising out of Defendant's conduct.

107.    Plaintiffs will fairly and adequately protect the interests of all Class Members. Plaintiffs have retained competent and experienced class action attorneys to represent their interests and those of the Class.

108.    Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class Members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

      a.    Whether Defendant breached its contract with Plaintiffs and Class Members by failing to set variable rates in the method dictated by the parties' contract;

      b.    Whether Defendant violated the duty of good faith and fair dealing in its consumer contracts;

      c.    Whether Defendant's conduct violates N.J.S.A. 56:8-1 *et seq.*;

      d.    Whether Defendant's conduct violates N.J.A.C. 14:4-7.3(d)(1) and 7.4(n)(1);

e.  Whether Defendant's misrepresentations and omissions are materially misleading;

f.  Whether Defendant's conduct violates various state consumer protection statutes;

g.  Whether Defendant was unjustly enriched as a result of its conduct;

h.  Whether Class Members have been injured by Defendant's conduct;

i.  Whether, and to what extent, equitable relief should be imposed on Defendant to prevent it from continuing its unlawful practices; and

j.  The extent of class-wide injury and the measure of damages for those injuries.

109.  A class action is necessary because (i) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; and (ii) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendant's conduct.

110.  A class action is appropriate because Defendant has acted or refused to act on grounds generally applicable to all Class Members.

111.  A class action is superior to all other available methods for resolving this controversy because questions of law and fact common to the Class predominate over any questions affecting only individual Class Members and a class action will fairly and efficiently adjudicate the controversy.

112.  Further, the following issues are also appropriately resolved on a class-wide basis under Federal Rule of Civil Procedure 23(c)(4):

a. Whether Defendant breached its contract with Plaintiffs and Class Members by failing to set variable rates in the method dictated by the parties' contract;

b. Whether Defendant violated the duty of good faith and fair dealing in its consumer contracts;

c. Whether Defendant's conduct violates N.J.S.A. 56:8-1 *et seq.*;

d. Whether Defendant's conduct violates N.J.A.C. 14:4-7.3(d)(1) and 7.4(n)(1);

e. Whether Defendant's misrepresentations and omissions are materially misleading;

f. Whether Defendant's conduct violates various state consumer protection statutes;

g. Whether Defendant was unjustly enriched as a result of its conduct;

h. Whether Class Members have been injured by Defendant's conduct; and

i. Whether, and to what extent, equitable relief should be imposed on Defendant to prevent it from continuing its unlawful practices.

113.    Accordingly, this action satisfies the requirements set forth under Federal Rule of Civil Procedure 23(a), 23(b), and 23(c)(4).

## CAUSES OF ACTION

### COUNT I
### Breach Of Contract

### (On Behalf Of Both Subclasses)

114.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

115.    South Bay customers have customer agreements whose variable rate pricing terms are identical or substantially similar.

116.    Plaintiffs and the Class entered into valid contracts with Defendant for the

provision of electricity and/or gas.

117.    South Bay uniformly represents to its New Jersey customers that its variable rates for energy will be "based upon market conditions." South Bay further represents that its variable rates for natural gas will "reflect South Bay Energy's wholesale cost of natural gas (including capacity, settlement, ancillaries, related transmission and distribution charges and other market-related factors); plus all applicable, fees, charges, costs, and South Bay Energy's expenses and margins," and that its variable rates for electricity will "reflect South Bay Energy's wholesale cost of electricity (including the cost of energy, capacity, settlement, ancillaries, related transmission and distribution charges and other market-related factors); plus all applicable, fees, charges, costs, and South Bay Energy's expenses and margins."

118.    Upon information and belief, Plaintiffs were subject to the same contractual terms for their variable rate for electricity and/or natural gas as all other customers in New Jersey, which is substantially similar to the variable rate contractual terms for all South Bay customers in the United States.

119.    Pursuant to the contracts, Plaintiffs and the Class paid the variable rates Defendant charged for electricity and gas.

120.    However, Defendant failed to charge variable rates in accordance with the terms of its contracts.  Instead, Defendant charged variable rates for electricity and gas that were untethered from the factors upon which the parties agreed the rate would be based.

121.    Plaintiffs and the Class were damaged as a result because they were billed, and they paid, a charge for electricity and/or gas that was higher than it would have been had Defendant complied with the contract.

122.    By reason of the foregoing, Defendant is liable to Plaintiffs and other Class

Members for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

<u>COUNT II</u>
**Breach Of The Implied Covenant Of Good Faith And Fair Dealing**

**(In The Alternative To Count I)**
**(On Behalf Of Both Subclasses)**

123.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

124.    Plaintiffs and the Class contracted with Defendant for the provision of electricity and/or gas supply.

125.    Every contract has an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and may be breached even if there is no breach of the contract's express terms.

126.    Under the contract, to the extent Defendant had discretion to set the variable rate for electricity or natural gas, it was obligated to exercise its discretion in good faith.

127.    Plaintiffs reasonably expected that South Bay's variable energy rates would not be continuously and significantly higher than the utilities' rates, which provide the same energy supply as South Bay.  Without these reasonable expectations, Plaintiffs and other Class Members would not have agreed to buy electricity or gas from Defendant.

128.    Plaintiffs reasonably expected that Defendant would refrain from price gouging. Without these reasonable expectations, Plaintiffs and other Class Members would not have agreed to buy electricity or gas from Defendant.

129.    Defendant breached the implied covenant of good faith and fair dealing by unreasonably exercising its rate-setting discretion to price gouge and frustrate Plaintiffs' and other

31

Class Members' reasonable expectations that Defendant's variable energy rate would be commensurate with market-related factors.

130.    As a result of Defendant's breaches, South Bay is liable to Plaintiffs and members of the Class for damages and attorney's fees and expenses.

<u>COUNT III</u>
**Violation Of The New Jersey Consumer Fraud Act**

**(On Behalf Of Plaintiffs And The New Jersey Class)**

131.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

132.    The New Jersey Consumer Fraud Act prohibits, *inter alia*:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise . . . .

 N.J.S.A. 56:8-2.

133.    Defendant's material omissions with respect to the rates charged for electricity and/or natural gas, as described above, constitute actionable omissions in connection with the marketing, advertising, promotion, and sale of electricity and/or natural gas in violation of the New Jersey Consumer Fraud Act.  Specifically, as detailed herein, Defendant made, and continues to make, the following material omissions,  including:

    a.  Failing to provide a contract that "describe[s] in clear and conspicuous language" to variable rate customers "the mechanism or formula by which the price is determined, and provide a detailed customer bill comparison" with the requisite information set forth in N.J.A.C 14:4-7.4(b)(1).

    b.  Failing to provide customers with a contract that discloses "the average price per kWh for electric generation service or the average price per therm for gas supply service being charged for basic generation service

or basic gas supply service by the [relevant local utility] over the same period" as the contract's duration.  N.J.A.C 14:4-7.4(a)(4).

c.  To the extent Defendant claims its exorbitant rates owe to its provision of optional services, Defendant's contract failed to "clearly and conspicuously identify each separate charge."  N.J.A.C. 14:4-7.4(g).

d.  Failing to provide a contract that points potential customers to a telephone number or website "which a customer may access to request detailed information concerning the average price per kWh for electric generation service or average price per therm for gas supply service over the term of a contract for the service being offered, exclusive of any charges for any optional services."  N.J.A.C. 14:4-7.4(a)(1).

e.  Failing to adequately disclose that Defendant's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges.

f.  Failing to adequately disclose that customers paying Defendant's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates.

g.  Failing to provide customers with adequate advance notice of the variable rates it would charge.

h.  Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged.

i.  Using a "glide path" practice to lull customers into not noticing that South Bay was engaging in price gouging by charging a rate based on a commercially unreasonable margin.

134.  The information Defendant concealed would have been material to any consumer deciding whether to purchase electricity and/or natural gas from Defendant.  If this information had not been concealed, then Plaintiffs and other class members would not have agreed to switch to South Bar for their energy supply.

135.  Defendant also engaged in unlawful misrepresentations.   Defendant's misrepresentations and false, deceptive, and misleading statements with respect to the rates charged for electricity and/or natural gas, as described above, constitute affirmative

misrepresentations in connection with the marketing, advertising, promotion, and sale of electricity and/or natural gas in violation of the New Jersey Consumer Fraud Act. During the rescissionary period, Defendant's contract serves as a solicitation because consumers may "cancel" the agreement before it becomes legally binding. The agreement is not legally binding prior to the expiration of the rescissionary period. Thus, the contract is an advertisement in which Defendant misrepresents how it's variable energy rates will be set. Specifically, as detailed herein, Defendant made, and continues to make, affirmative misrepresentations, including:

    a. Providing a materially misleading contract that misrepresents how Defendant's variable rates will be set.

    b. Providing a materially misleading contract that fails to state "the average price per kWh for electric generation service or the average price per therm for gas supply service being charged for basic generation service or basic gas supply service by the [relevant local utility] over the same period" as the contract's duration. N.J.A.C. 14:4-7.4(a)(4).

    c. Providing a materially misleading contract that fails to "describe in clear and conspicuous language" to variable rate customers "the mechanism or formula by which the price is determined, and provide a detailed customer bill comparison" with the requisite information set forth in N.J.A.C. 14:4-7.4(b)(1).

    d. To the extent Defendant claims its exorbitant rates owe to its provision of optional services, Defendant provided a materially misleading contract that failed to "clearly and conspicuously identify each separate charge." N.J.A.C. 14:4-7.4(g).

    e. Providing a materially misleading contract that fails to point potential customers to a telephone number or website "which a customer may access to request detailed information concerning the average price per kWh for electric generation service or average price per therm for gas supply service over the term of a contract for the service being offered, exclusive of any charges for any optional services." N.J.A.C. 14:4-7.4(a)(1).

136.    Defendant's false, deceptive, and misleading statements would have been material

to any potential consumer's decision to purchase electricity and/or natural gas from Defendant. Had Defendant not made these misrepresentations, then Plaintiffs and other class members would not have agreed to switch to South Bar for their energy supply.

137.    Defendant's misrepresentations and omissions were outside the norm of reasonable business practices, unconscionable, and constitute substantial aggravating circumstances under the New Jersey Consumer Fraud Act.  Had Defendant not committed the misrepresentations and omissions detailed herein, Plaintiffs and New Jersey Class Members would not have agreed to accept Defendant's gas and electric services.

138.    Defendant made these false, deceptive, and misleading statements and omissions with the intent that its customers rely upon such statements.

139.    Plaintiffs and the other members of the New Jersey Class entered into agreements to purchase electricity and/or natural gas from Defendant and suffered ascertainable loss as a direct and proximate result of Defendant's actions in violation of the New Jersey Consumer Fraud Act.

140.    As a consequence of Defendant's wrongful actions, Plaintiffs and the other members of the New Jersey Class suffered an ascertainable monetary loss, including but not limited to the difference between the price Plaintiffs and Class Members paid and the price they would have paid had Defendant set the variable rate consistent with market pricing and/or the utility's rate, which is a reflection of market pricing, and damages consistent with statutory penalties.

141.    Plaintiffs and other members of the New Jersey Class suffered an ascertainable loss caused by Defendant's misrepresentations and omissions because they would not have entered into an agreement to purchase electricity and/or natural gas from Defendant if the true

facts concerning its rates had been known.

142.    By reason of the foregoing, Defendant is liable to Plaintiffs and the other members of the New Jersey Class for trebled compensatory damages; punitive damages; attorneys' fees, and the costs of this suit.  N.J.S.A. 56:8-2.11, 8-2.12, 8-19.

143.    Defendant knows full well that it charges variable rates that are unconscionably high, and the misrepresentations and omissions it makes with regard to its rates were made to induce customers to purchase electricity from Defendant so it can reap outrageous profits to the direct detriment of its New Jersey customers and without regard to the consequences high utility bills cause such consumers.  Defendant's conduct was intentional, wanton, willful, malicious, and in blatant disregard of, or grossly negligent and reckless with respect to the well-being of Plaintiffs and the other members of the Class.  Defendant is therefore additionally liable for punitive damages, in an amount to be determined at trial.

## COUNT IV
### Violation Of Materially Identical State Consumer Protection Statutes

### (On Behalf Of The Multistate Class)

144.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

145.    Pursuant to the materially identical consumer protection statutes of New Jersey, New York, Pennsylvania, Ohio, and Illinois, consumers are protected against deceptive acts or practices, misrepresentations, or omissions which affect business, trade, or commerce.

146.    South Bay violated at least the following materially identical statutes:

   a.   New Jersey Consumer Fraud Act, N.J.S.A. 56:8-2;

   b.   New York General Business Law § 349;

   c.   Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-2(4);

      d.   Ohio Consumer Sales Practices Act, Ohio Rev. Code §§ 1345.02, .03; and

      e.   Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS § 505/2.

147.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class.

148.    Defendant's marketing and sales practices are consumer-oriented in that they are directed at members of the consuming public.

149.    Defendant has engaged in, and continues to engage in, deceptive acts and practices, including:

      a.   Failing to adequately disclose that Defendant's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges;

      b.   Failing to adequately disclose that consumers paying Defendant's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates;

      c.   Failing to provide customers adequate advance notice of the variable rates it would charge;

      d.   Failing to adequately disclose the variable rate methodology South Bay used to calculate its variable rates to enable consumers to potentially compare prices;

      e.   Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged; and

      f.   Using a "glide path" practice to lull customers into not noticing that South Bay was engaging in price gouging by charging a rate based on a commercially unreasonable margin.

150.    The above unfair and deceptive practices and acts by South Bay were material omissions of existing or past facts. If this information had not been concealed, then Plaintiffs and other class members would not have agreed to switch to South Bar for their energy supply.

151.    Defendant knew or believed that the above unfair and deceptive practices and acts were material omissions.

152.    Defendant also engaged in unlawful misrepresentations.    Defendant's misrepresentations and false, deceptive, and misleading statements with respect to the rates charged for electricity and/or natural gas, as described above, constitute deceptive acts and practices.   During the rescissionary period, Defendant's contract serves as a solicitation because consumers may "cancel" the agreement before it becomes legally binding.   The agreement is not legally binding prior to the expiration of the rescissionary period.   Thus, the contract is an advertisement in which Defendant misrepresents that the variable energy rates will be based upon market pricing.   Specifically, as detailed herein, Defendant made, and continues to make, affirmative misrepresentations, including providing a materially misleading contract that misrepresents how Defendant's variable rates will be set.

153.    Defendant's false, deceptive, and misleading statements would have been material to any potential consumer's decision to purchase electricity and/or natural gas from Defendant. Had Defendant not made these misrepresentations, then Plaintiffs and other class members would not have agreed to switch to South Bar for their energy supply.

154.    The aforementioned acts are continuing, unconscionable, and deceptive and are contrary to each state's public policy, which aims to protect consumers.

155.    Defendant's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to continue to purchase electricity and/or gas from South Bay.

156.    Defendant knew at the time it signed up Plaintiffs and prospective customers that the price of a customer's electricity and/or gas supply was a material factor in choosing South Bay.

157.    Defendant knew at the time it signed up Plaintiffs and prospective customers that a customer's primary alternative to South Bay was the customer's local utility.

158.    Defendant knew at the time it signed up Plaintiffs and prospective customers that South Bay's marketing of variable rates was premised on offering customers a lower electricity or gas rate than the customer's local utility.

159.    Defendant knew at the time it signed up Plaintiffs and prospective customers that South Bay's variable rates for electricity and gas were consistently substantially higher than Plaintiffs' and prospective customer's local utility rate, a rate based on market factors.

160.    Defendant's omission that its variable rate for electricity or gas was consistently substantially higher than the local utility rate is material to prospective customers.

161.    Defendant's intentional concealments were designed to deceive current and prospective variable rate customers into believing that rates will be commensurate with market prices as specified in the contract.  By concealing its actual pricing strategy (artificially inflating prices and maximizing profits), Defendant deprives consumers from being able to make informed purchasing decisions.

162.    Defendant's practices are unconscionable and outside the norm of reasonable business practices.

163.    As a direct and proximate result of Defendant's unlawful deceptive acts and practices, Plaintiffs and Class Members switched to and remained with South Bay and suffered and continue to suffer an ascertainable loss of monies based on the difference in the rate they

were charged versus the rate they would have been charged had Defendant charged a competitive rate based on market pricing, as well as the difference in South Bay's variable rate and the default rate utilities charge, which is the rate Plaintiffs and Class Members would have received had they not been deceived into accepting electricity and gas supply from Defendant. By reason of the foregoing, Defendant is liable to Plaintiffs and Class Members for trebled compensatory damages, attorneys' fees, and the costs of this suit.

164.    Plaintiffs and the members of the Class further seek equitable relief against Defendant. This Court has the power to award such relief, including but not limited to, an order declaring Defendant's practices to be unlawful, an order enjoining Defendant from engaging in any further unlawful conduct, and an order directing Defendant to return to the Plaintiffs and the Class all amounts wrongfully assessed and/or collected.

165.    As a result of Defendant's deceptive acts or practices, Plaintiffs and Class Members suffered actual damages in an amount to be determined at trial, and are entitled to their damages, costs, and reasonable attorneys' fees and all other relief available under each state's respective consumer protection statute.

## <u>COUNT V</u>
### Violation Of The Truth-In-Consumer Contract, Warranty, And Notice Act ("TCCWNA")

### (On Behalf Of Plaintiffs And The New Jersey Class)

166.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

167.    The TCCWNA states:

No seller, lessor, creditor, lender or bailee shall in the course of his business offer to any consumer or prospective consumer or enter into any written consumer contract or give or display any written consumer warranty, notice or sign after the effective date of this act which includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller, lessor, creditor,

lender or bailee as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed.

N.J.S.A. 56:12-15.

168.    Plaintiffs and New Jersey Class Members are "consumers" within the meaning of N.J.S.A. 56:12-15.

169.    Defendant is a "seller" within the meaning of N.J.S.A. 56:12-15.

170.    Defendant violated the TCCWNA by inducing Plaintiffs and New Jersey Class Members to switch their energy supplier to Defendant using contract terms that violate the CFA by making misrepresentations and false, deceptive, and misleading statements and material omissions with respect to the rates charged for electricity and/or natural gas, as described above, in connection with the marketing, advertising, promotion, and sale of electricity and/or natural gas.  N.J.S.A. 56:8-2.

171.    Defendant violated Plaintiffs' and New Jersey Class Members' legal rights under the CFA and therefore, Defendant violated the TCCWNA.

172.    As a result of Defendant's violations of the TCCWNA, Plaintiffs and Class Members are entitled to statutory damages of not less than $100 for each of Defendant's TCCWNA violations.  N.J.S.A. 56:12-17.

## <u>COUNT VI</u>
**Violation Of The EDECA And Retail Choice Consumer Protection Regulations**

**(On Behalf Of Plaintiffs And The New Jersey Class)**

173.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

174.    Under N.J.A.C. 14:4-7.3(d)(1) electric power and gas suppliers like Defendant are prohibited from making false or misleading advertising claims to a potential residential customer.

175.    Under N.J.A.C. 14:4-7.4(n)(1) electric power and gas suppliers like Defendant are prohibited from making false or misleading marketing claims to a potential residential customer.

176.    N.J.A.C. 14:4-7.13 provides a private right of action to residential customers who were subjected to false or misleading advertising or marketing by an electric power or gas supplier in violation of either N.J.A.C. 14:4-7.3(d)(1) or 14:4-7.4(n)(1).

177.    Defendant's material misrepresentations and omissions with respect to the rates charged for electricity and/or natural gas, as described above, constitute false and misleading advertising and marketing under N.J.A.C. 14:4-7.3(d)(1) or 14:4-7.4(n)(1).  Specifically, as detailed herein, Defendant made, and continues to make, the following material misrepresentations and omissions,  including:

  a.  Providing a materially misleading contract that misrepresents how Defendant's variable energy rates will be calculated;

  b.  Failing to adequately disclose that Defendant's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges;

  c.  Failing to adequately disclose that customers paying Defendant's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates;

  d.  Failing to provide customers with adequate advance notice of the variable rates it would charge;

  e.  Failing to adequately disclose the variable rate methodology Defendant used to calculate its variable rates to enable customers to potentially compare prices;

f.   Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged; and

g.   Using a "glide path" practice to lull customers into not noticing that South Bay was engaging in price gouging by charging a rate based on a commercially unreasonable margin.

178.   Defendant first made this false and misleading advertising prior to the conclusion of the rescissionary period of the contract, during which Defendant's contract served as a solicitation. The agreement is not legally binding prior to the expiration of the rescissionary period. Thus, the contract is an advertisement in which Defendant violates the prohibition against false and misleading advertising.

179.   Plaintiffs and all New Jersey Class Members were subjected to Defendant's false and misleading advertising and marketing under N.J.A.C. 14:4-7.3(d)(1) or 14:4-7.4(n)(1).

180.   Defendant collected charges for electric generation service and/or gas supply service from Plaintiffs and all New Jersey Class Members.

181.   By reason of the foregoing, Defendant is liable to Plaintiffs and New Jersey Class Members for an amount equal to all charges paid by these customers to Defendant after such violations occurred.

182.   By reason of the foregoing, Defendant is also liable to Plaintiffs and New Jersey Class Members for a civil penalty pursuant to N.J.S.A. 48:3-83.

183.   Plaintiffs and the members of the New Jersey Subclass further seek equitable relief against Defendant. This Court has the power to award such relief, including but not limited to, an order declaring Defendant's practices to be unlawful, an order enjoining Defendant from engaging in any further unlawful conduct, and an order directing Defendant to return to the Plaintiffs and the Class all amounts wrongfully assessed and/or collected.

184.    As a result of Defendant's false and misleading advertising and marketing, Plaintiffs and New Jersey Class are also entitled to their damages, costs, and reasonable attorneys' fees and all other relief available.

### COUNT VII
### Unjust Enrichment

### (In The Alternative To Contract Claims)
### (On Behalf Of Both Subclasses)

185.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

186.    This cause of action is pleaded in the alternative to Plaintiffs' contract claims.  To the extent the Court determines that a valid contract exists between the parties, Plaintiffs do not intend to proceed with their unjust enrichment claim.

187.    Plaintiffs and the Class conferred a tangible economic benefit upon Defendant by contracting with Defendant for electricity or gas.  Plaintiffs and the Class would not have contracted with Defendant for electricity and gas had they known that Defendant would abuse its discretion and the information asymmetry to charge rates substantially in excess of competing rates available on the market.

188.    Plaintiffs and the Class would not have purchased energy from Defendant had they known the truth about Defendant's variable energy rates.

189.    By engaging in the conduct described above, Defendant has unjustly enriched itself and received a benefit beyond what was contemplated by the parties at the expense of Plaintiffs and the Class.

190.    It would be unjust and inequitable for Defendant to retain the payments Plaintiffs and Class Members made for excessive energy charges.

191.    Therefore, Defendant is liable to Plaintiffs and Class Members for the damages that they have suffered as a result of Defendant's actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

(a)    Issue an order certifying the Classes defined above, appointing the Plaintiffs as Class Representatives, and designating the undersigned firms as Class Counsel;

(b)    Find and declare that Defendant South Bay has committed the violations of law alleged herein;

(c)    Render an award of compensatory and statutory damages, the precise amount of which is to be determined at trial;

(d)    Issue an injunction or other appropriate equitable relief requiring Defendant to refrain from engaging in the deceptive practices alleged herein;

(e)    Render an award of punitive damages;

(f)    Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(g)    Grant all such other relief as the Court deems appropriate.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38, Plaintiffs demand that a jury determine any issue triable of right.

## NOTICE TO ATTORNEY GENERAL

A copy of this Complaint will be emailed to the Attorney General of the State of New Jersey within twenty-hour hours of its filing, pursuant to N.J.S.A. 56:8-20.

A copy of this Complaint will be mailed to the Attorney General of the State of Illinois within ten days of its filing, pursuant to 815 ILCS 505/10(a)(d).

Dated: December 4, 2023

**WITTELS MCINTURFF PALIKOVIC**

By:  s/ Jessica L. Hunter

Jessica L. Hunter (ID No. 282432018)
J. Burkett McInturff*
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
jlh@wittelslaw.com
jbm@wittelslaw.com

D. Greg Blankinship*
**FINKELSTEIN, BLANKINSHIP,**
**FREI-PEARSON & GARBER, LLP**
One North Broadway, Suite 900
White Plains, New York 10601
Telephone: (914) 298-3281
gblankinship@fbfglaw.com

* *Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff George Fera, Joyce Fera,*
*Pinwheel Cafe LLC, and the Proposed Class*